IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF UTAH

| | |
|---|---|
| HOUWELING'S NURSERIES OXNARD, INC., a California corporation; HOUWELING UTAH PROPERTY, INC., a Utah corporation; HNL HOLDINGS LTD., a Canadian controlled private corporation; HOUWELING UTAH HOLDINGS, INC., a Utah corporation; and HNL UTAH HOLDING LTD.; a Canadian controlled private corporation, | MEMORANDUM DECISION AND ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT |
| *Plaintiffs and Counterclaim Defendants*, | Case No. 2:14-cv-00611-JNP-PMW |
| v. | Judge Jill N. Parrish |
| GEORGE ROBERTSON, an individual, | Magistrate Judge Paul M. Warner |
| *Defendant and Counterclaimant.* | |
| GEORGE ROBERTSON, an individual, | |
| *Third-Party Plaintiff*, | |
| v. | |
| CASEY HOUWELING, an individual, | |
| *Third-Party Defendant.* | |

## I. INTRODUCTION

This is a contract case. Houweling's Nurseries Oxnard, Inc.; Houweling Utah Property, Inc.; HNL Holdings Ltd.; Houweling Utah Holdings, Inc.; and HNL Utah Holdings Ltd. (collectively, "Houweling") filed the instant lawsuit seeking a declaration that Houweling does not owe George Robertson additional compensation for his work developing a tomato greenhouse in Mona, Utah. In response, Robertson filed counterclaims against Houweling for (1) breach of written contract, (2) breach of oral contract, (3) breach of the implied covenant of good faith and fair dealing, and (4) declaratory and injunctive relief. Robertson also named Casey Houweling, the President of Houweling, as a third-party defendant.

Casey Houweling and Houweling have moved for summary judgment on all claims, asserting that Houweling never entered into a contract to pay Robertson additional compensation (ECF No. 83). Houweling also seeks a declaration that it is the owner of the greenhouse project in Mona, Utah, and that Robertson has no right to further compensation from Houweling. Having considered the Motion, the related pleadings, and the record, the Court GRANTS Plaintiffs' Motion for Summary Judgment.

## II. UNDISPUTED FACTS

### A. The Initial Proposal

On December 8, 2011, George Robertson, through email, proposed a deal with Houweling to develop a tomato greenhouse in Utah. Robertson proposed that Houweling contract with Robertson's entity "Yuum A" to create "Utah Hot House"—a tomato greenhouse in Utah. Casey Houweling, the President of Houweling, informed Robertson that Houweling was "interested" but that it had also been "approached by [another] party that want[ed] to do a similar deal" and thus Houweling would need to "go forward cautiously."

A few months later, on April 1, 2012, Robertson again approached Houweling about the tomato-greenhouse opportunity. This time, Robertson submitted a "Partnership Proposal" for "Houweling's Utah Hot House" with Robertson again proposing to use Yuum A to partner with Houweling. Houweling did not accept the proposal. As part of the proposal, Robertson also sent Houweling a draft Note Purchase Agreement and Convertible Note on April 3, 2012. Houweling never executed the Note Purchase Agreement or Convertible Note.

On April 4, 2012, Robertson sent Houweling a one-page "basic approach" for the "Utah Hot House Development Proposal." Robertson proposed that Houweling and Yuum A would develop, construct, and operate Utah Hot House, which would be owned 91% by Houweling and 9% by Yuum A, LCC. Under the proposal, Houweling would pay Robertson a $20,000 fee for his "prior work in delivering the opportunity to Houweling's."

**B.    The Independent Consulting Agreement**

The day after sending the one-page basic approach, Robertson sent Casey Houweling and Peter Cummings, Houweling's then CFO, an email stating, "[Casey Houweling] and I spoke. We agreed on the arrangement. I want to make sure that we are on the same page. Here's my understanding." The email contained nine tasks or duties that Robertson would perform in pursuit of the tomato-greenhouse opportunity. After listing the tasks and duties, Robertson wrote, "That's it in a nutshell. We agreed on the $20,000 payment now and beginning in May $15,000 as a monthly fee, provided the project receives the go-ahead after the initial meetings in Utah."

Casey Houweling responded with an email that read, "Peter [Cummings]. This is what we discussed. Please execute." Houweling paid Robertson $20,000, a "bonus for [Robertson's] prior work in delivering the opportunity to Houweling's." And Houweling began to pay Robertson a $15,000 monthly fee on May 1, 2012.

A few weeks later, on April 23, 2012, Robertson emailed Casey Houweling and Cummings a draft Mutual Non-Disclosure Agreement and a draft Consulting Agreement. Houweling executed the Mutual Non-Disclosure Agreement on April 25, 2012. The Mutual Non-Disclosure Agreement provided that "[t]he Parties have previously executed a Consulting Agreement, which is made a part of this agreement by reference." Houweling, however, never executed the Consulting Agreement. Instead, Cummings, after executing the Non-Disclosure Agreement, explained to Robertson that Houweling had held off on signing the Consulting Agreement because Casey Houweling wanted to further discuss the bonus terms with Robertson: "So [we'll] defer signing [the Consulting Agreement] until bonus terms are completed."

Houweling continued to pay Robertson $15,000 per month for the months of June, July, August, and September 2012. Houweling reduced Robertson's compensation to $6,000 per month from October 2012 through March 2013 and then raised it to $10,000 per month from April 2013 through September 2013. Starting in October 2013, Houweling paid Robertson $15,000 per month until he was terminated in July 2014.

### C.     Bonus Negotiations

On January 29, 2014, Robertson sent a letter to Casey Houweling and Cummings by email in which he discussed an "additional compensation bonus program." The deal summary included two proposals: (1) Plan A, which proposed an annual dividend equal to 8% of income before taxes and an issuance of shares in a special class of stock in Houweling; or (2) Plan B, which proposed that Houweling pay Robertson 10% of income before taxes as profit sharing. Houweling did not accept either proposal. On February 1, 2014, Robertson sent Houweling a draft Description of Preferred Stock agreement. Neither Houweling nor Robertson ever executed the agreement.

On February 17, 2014, Robertson sent an email to Casey Houweling "[r]egarding our deal and background." In the email, Robertson states, "I know we still have a ways to go, but it is time to make sure we are on the same page in Utah. . . . Lets [sic] discuss and reach an agreement before I leave [for Utah]." The following day, Robertson sent a draft proposal titled "Development Agreement" to Casey Houweling and Cummings. In paragraph 5.3 of the Development Agreement, Robertson proposed a term titled "Bonus Compensation." Houweling never accepted the Development Agreement.

On February 21, 2014, Casey Houweling sent Robertson a letter concerning the history of their relationship and a proposal for additional compensation. In the letter, Casey Houweling wrote:

> 5.    During our discussions, at no time did I commit to paying you anything beyond the monthly fees, but I did, "leave the door open" to discuss equity participation if the project advanced to completion. . . .

> 9.    During September and October 2013, we had casual conversations concerning your compensation with Houwelings and I asked you to provide . . . me with a proposal, which you did on October 28, 2013. We subsequently met with you at our Delta facility and indicated the following:

>> a.    Any additional compensation beyond our monthly retainer would be paid via a percentage of operating earnings with terms to be agreed.

>> b.    Any direct equity ownership would be on the basis of actual purchase of equity.

>> c.    There was a possibility of employment during the project construction phase, and employment in a managerial capacity once the project went live.

Casey Houweling proposed two options: (1) additional compensation of $734,000, assuming that the greenhouse project was completed by October 2014 and Robertson stayed until completion; or (2) participation on an equity basis. Robertson rejected both proposals.

On February 21, 2014, Robertson emailed a counteroffer to Houweling. In the email, Robertson wrote, "When you say you never agreed to anything, I agree. It's a matter of settling ownership between us without involving third parties to make a valuation." Robertson proposed that he would continue to develop the project on a "cash out" program based on receipt of the following amounts: (1) $75,000 on March 15, 2014; (2) $25,000 per month starting March 1, 2014, through project commission (first planting); and (3) 3% of total project capital investment as a developer fee paid in two equal payments on January 15, 2015 and January 16, 2016. Houweling rejected the counteroffer with an email from Cummings to Robertson stating that Houweling was "prepared to send [Robertson] a formal offer." Cummings also outlined five "issues" that still existed with respect to reaching a final agreement.

On March 3, 2014, Robertson responded to Cumming's email stating that his response was "very close to [Houweling's] proposal." Robertson proposed that Houweling pay him a development fee of $1.395 million. The amount owed to Robertson under his proposal would be reduced by past and future "retainer" payments such that Houweling would pay off the balance by executing four promissory notes to Robertson totaling $1.014 million. Houweling rejected the proposal and never executed the promissory notes.

Over a month later, on April 8, 2014, Robertson sent an executed letter agreement to Houweling for signature. Three days later, Robertson sent a revised version of the letter agreement that he had also executed. Both letter agreements contained terms for additional payment to Robertson for development services related to the greenhouse project. Houweling did not execute either the April 8 or April 11 letter agreements.

On April 13, 2014, Cummings sent Robertson an email discussing various deal terms and changes to the proposed letter agreement. After setting forth Houweling's material terms,

Cummings wrote, "Assuming that you can consent to the foregoing, your proposed agreement needs to be adjusted for these changes." Specifically, Cummings wrote:

> 2.     [Casey Houweling] is NOT willing to pay any interest on outstanding amount to you.
>
> 3.     [Casey Houweling] is having second thoughts about the income tax structuring that you have proposed, and in any event, this would need to be adjusted for payments up to the end of 2012 as we have already disclosed these payments to the US Government as Consulting Fees paid to you. Based upon our tax advice, we believe that the fact pattern does NOT support a sale of a Development Interest and would be reversed if we were subsequently audited, potentially exposing Houweling[] to additional payments on your behalf, penalties and interest.

Cummings also wrote, "Casey [Houweling] consents to the lump sum payments in April so that you can settle other obligations that you have, assuming that we conclude on this deal, this week."

On April 13, 2014, Robertson sent an email to Casey Houweling responding to Cummings' email from earlier that day. In the email, Robertson wrote, "I am not willing to accept a no interest deal as the value of money diminishes over time. There will be no tax issues for Houweling's."

The next day, April 14, 2014, at 1:24 p.m., Robertson sent an email to Casey Houweling and Cummings setting forth his understanding of the basic terms of the deal based on a prior discussion. Robertson proposed that the balance owed to him would "be carried at 2% annual interest." In the email, Robertson asked Houweling to "confirm" the deal terms and indicated that he "[would] have a more formal agreement the next week of April 21 when [Cummings] return[ed] from Guatemala." Robertson did not address Houweling's tax concerns in the email. The same day at 4:12 p.m., Cummings made arrangements to wire Robertson $50,000. In the

internal email arranging the payment, Cummings wrote, "Casey [Houweling] has consented to a contractual relationship with George and has agreed that we would wire him $50K tomorrow."

Later that day at 9:57 p.m., Robertson sent Houweling and Cummings a proposed agreement for execution. Robertson wrote that the proposed agreement was "per our discussion earlier today." The agreement did not contain a provision addressing Houweling's tax concerns. Robertson suggested that the parties could "execute next week in Utah." Neither Casey Houweling nor Robertson ever signed the agreement.

The following day, April 15, 2014, Cummings sent an email at 10:02 p.m. proposing changes to the draft agreement that Robertson sent on April 14, 2014. Cummings sought to clarify a question regarding future monthly payments through the end of 2014. In addition to raising concerns with the wording of Robertson's draft agreement regarding future monthly payments, Cummings noted that he was "making a few other minor edits" that he would forward after he received clarification from Robertson. Later that day, Robertson clarified the proposed payments included in the proposed agreement. And Cummings replied that he would "make some amendments to the wording" of the proposed agreement "so it is more clear." On April 25, 2014, Houweling arranged to wire Robertson a second $50,000 payment.

On April 26, 2014, Cummings sent an email to Robertson to which he attached Houweling's revisions to Robertson's April 14 proposed letter agreement. Cummings stated in the email that he had "made a number [of] edits" and that the agreement was "final from [Houweling's] perspective." Cummings also wrote, "If you are satisfied, please execute and send a pdf to us and we'll get an executed copy back to you."

In Cummings' April 26 edits to the letter agreement, he revised the payment terms of the agreement per his discussion with Robertson. And he included the following two paragraphs:

Robertson agrees that in the event that the US Internal Revenue Service (IRS) re-characterizes all amounts paid under this agreement as Consulting Fees rather than a Sale of a Development Interest as contemplated herein, Robertson agrees to indemnify and hold Houweling harmless against any demand made by the IRS for any additional Federal or State income taxes owing to Robertson. In addition, Houweling may pay to the IRS any remaining amounts owing to Robertson pursuant to a demand made by the IRS in respect to this agreement.

The parties mutually agree that this Agreement will be governed by the laws of the Province of British Columbia. Any suit, action or proceeding arising out of the subject matter hereof, or the interpretation, performance or breach hereof, shall be instituted in the Province of British Columbia.

Robertson admits that he never executed the April 26, 2014 letter agreement. He testified, "It says right there 'may pay to the IRS any remaining amounts owing to Robertson.' I'm not sure anybody would agree to that, but I didn't." On July 4, 2014, Houweling sent a letter to Robertson terminating its consulting arrangement with him.

### D. The Parties' Ownership Interests

On March 31, 2014, Houweling Utah Property, Inc. received a warranty deed from the owners of approximately 131.72 acres of real estate in Juab County, Utah, for the greenhouse project. In March and April 2014, Houweling Utah Property, Inc. entered into approximately $55 million of financing by executing and/or supplementing master loan agreements, promissory notes, and deeds of trust. Robertson was not a borrower or a guarantor for the financing and had no ownership interest in the greenhouse project. Robertson has not served as an officer or director for a Houweling entity, and he has not owned any stock in any of the Houweling entities.

## III. DISCUSSION

### A. Motion Standard

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has met this burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To do so, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

When the nonmoving party bears the burden of proof at trial on a dispositive issue, that party must "go beyond the pleadings" and "designate specific facts" so as to "make a showing sufficient to establish the existence of an essential element to that party's case." *Celotex*, 477 U.S. at 322. "The plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* Thus, summary judgment is not a "disfavored procedural shortcut" but rather "an integral part of the Federal Rules as a whole" that is designed "to secure the just, speedy and inexpensive determination of every action."

### B. Breach of Written and Oral Contract Claims

Robertson claims that Houweling accepted the terms in Robertson's April 14, 2014 email, sent at 9:57 p.m. (the alleged "Buyout Contract"), when Houweling wired Robertson two $50,000 payments. While styled as two different claims, Robertson's breach of written contract and breach of oral contract claims both turn on whether Houweling manifested an intent to be

bound to the alleged Buyout Contract through written and verbal communications. Robertson claims:

> [T]he Buy Out Contract was agreed to by all parties and is a binding written agreement. In the alternative, some material terms may be found not in the writing. Robertson and Houweling Entities nevertheless agreed on the necessary material terms of the Buy Out Contract through written and verbal communication.

In other words, Robertson claims that the alleged Buyout Contract forms the basis of the parties' obligations and that Houweling accepted it verbally or in writing. In response, Houweling claims that, despite the two $50,000 payments, the undisputed facts show that it did not accept the terms of the alleged Buyout Contract because both parties manifested an intent to defer legal obligations until they could execute a formal contract. The Court agrees with Houweling.

Under Utah law, an action for breach of contract requires proof of four elements: (1) the existence of a valid contract; (2) performance by the party seeking recovery; (3) breach of contract by the other party; and (4) damages. *Bair v. Axiom Design, L.L.C.*, 20 P.3d 388, 392 (Utah 2001). At issue here is whether Robertson and Houweling entered into a valid contract under which Robertson is entitled to additional compensation. Whether a contract exists is a question of law, *Uhrhahn Constr. & Design, Inc. v. Hopkins*, 179 P.3d 808, 813 (Utah Ct. App. 2008), and the party seeking enforcement of the contract, Robertson, bears the burden of proving the contract's existence, *Oberhansly v. Earle*, 572 P.2d 1384, 1386 (Utah 1977).

"It is fundamental that a meeting of the minds on the integral features of an agreement is essential to the formation of a contract." *Richard Barton Enters. v. Tsern*, 928 P.2d 368, 373 (Utah 1996). To determine whether there has been a "meeting of the minds," a court should consider "all preliminary negotiations, offers, and counteroffers and interpret the various expressions of the parties [to determine] whether the parties reached agreement on complete and

definite terms." *Lebrecht v. Deep Blue Pools & Spas, Inc.*, 374 P.3d 1064, 1069 (Utah Ct. App. 2016).

Offer and acceptance are the traditional tools for determining whether there has been a "meeting of the minds." *See id.* "An offer is a manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to the bargain is invited and will conclude it," and an acceptance "must unconditionally assent to all material terms presented in the offer, including price and method of performance, or it is a rejection of the offer." *Id.* (internal quotation marks omitted).

If, however, a party manifests an intent to defer legal obligations until a written agreement is executed "*in any way*," then "the preliminary negotiations and agreements do not constitute a contract." *Id.* at 1070-71 (emphasis added) (quoting *R.J. Daum Const. Co. v. Child*, 247 P.2d 817, 820 (Utah 1952)).[1] For instance, in *Lebrecht*, the parties had not created an enforceable settlement agreement, despite the fact that both parties signed a term sheet, because neither party had "definitely agree[d] [that] their dispute was settled; rather, they made clear their intention *to enter into a written settlement agreement in the future*." *Id.* at 1072 (emphasis added). Notably, there was no meeting of the mind despite the fact that the parties acknowledged that they "had reached some essential terms," outlined in the terms sheet, and both parties initialed or signed the terms sheet. *Id.* at 1071.

---

[1] Robertson cites *Holt v. Katsanevas*, 854 P.2d 575, 580 (Utah 1993), for the proposition that "contracts can be formed based on 'performance . . . exclusively referable to the alleged contract' or 'a party [that] has changed [its] position by performing.'" However, Robertson omits relevant language showing that the language from *Holt* speaks to an exception to the statute of frauds, not contract formation: "[T]ransactions for the *sale of realty* may be *exempted from the statute of frauds* where there is 'sufficient performance on the part of [one party] exclusively referable to the alleged contract to exempt it from the effect of the statute of frauds.'" *Id.* (emphasis added).

In a similar case, *Homestead Golf Club, Inc. v. Pride Stables*, 224 F.3d 1195 (10th Cir. 2000), a property owner and a developer did not form an enforceable contract because they signed a letter of commitment that manifested an intent to defer legal obligations until they executed a written agreement, which was never executed. In *Homestead Golf*, the property owner claimed that it granted an oral license to the developer that allowed the developer to construct a golf course on the property owner's land in exchange for a loan of $185,000. *Id.* at 1198. Both parties singed the letter of commitment, which provided, in relevant part, "The underlying agreements between the parties necessary to make such commitment have been reached in principle and are *awaiting final documentation*, which is expected to be prepared and signed within the next two weeks." *Id.* at 1200 (emphasis added). Because the parties never executed a formal agreement, there was no contract, despite the fact that the developer had fronted "$5,000 of the agreed-on $185,000 loan" and begun construction of the golf course. *Id.* at 1202.

While Robertson argues that Houweling agreed to the letter agreement in his email sent on April 14, 2014 at 9:57 p.m., the undisputed facts show that the parties intended to defer legal obligations until they executed a formal agreement. In Robertson's April 14 email sent at 1:24 p.m., Robertson asked Cummings to "confirm the basics of the deal going forward." Robertson then sets out his understanding of the deal and writes, "Casey [Houweling], please confirm, *wire the money and I will have a more formal agreement the week of April 21 when you return from Guatemala*." (emphasis added). At 4:12 p.m., in an internal email, Cummings arranged to have $50,000 wired to Robertson, as Robertson had requested in the email. In the email Cummings wrote, "Casey [Houweling] has consented to a contractual relationship with George [Robertson] and has agreed that we would wire him $50K tomorrow." However, this email was not communicated to Robertson. Later that day, at 9:57 p.m., Robertson sent Cummings another

13

email in which he wrote, "Casey, attached is the agreement per our discussion earlier today. I couldn't sign since I am in Utah and don't have a way to scan. *We can execute next week in Utah*." (emphasis added). Attached to the email was Robertson's proposed letter agreement, which proposed that Houweling would pay Robertson $100,000 in two equal payments on April 15, 2014 and April 22, 2014.

Both emails from Robertson on April 14 manifest an intent to defer legal obligations until sometime the following week, when the parties would be in Utah to execute a formal agreement. Thus, although Houweling had arranged to wire Robertson $50,000 on April 15, 2014, the parties had not manifested an intent to be bound because they contemplated executing a formal agreement. *See R.J. Daum*, 247 P.2d at 820 ("An acceptance must be clear, positive and unambiguous."). The same goes for the second $50,000 payment on April 25, 2014. Further, Cummings' internal email in which he wrote that "Casey [Houweling] has consented to a contractual relationship with George" was never communicated to Robertson—undermining Robertson's argument that this is proof that Houweling manifested an intent *to Robertson* that it intended to be bound to the Buyout Contract. Like *Homestead Golf*, in which the parties did not manifest an intent to be bound despite the exchange of $5,000, the two payments of $50,000 to Robertson—which allowed Robertson to pay creditors—did not manifest Houweling's intent to be bound to the proposed agreement. Robertson also ignores the fact that the two $50,000 payments were wired to him in accord with the request in his April 14 email: "*wire the money and I will have a more formal agreement the week of April 21*." (emphasis added).[2]

---

[2] At oral argument, counsel for Robertson stated that *Cardella v. Mountain Reservations, Inc.*, 2:07-cv-1003-BCW, 2009 WL 971925 (D. Utah Apr. 7, 2009), is Robertson's "best case." However, the facts of *Cardella* are not similar to the case at hand. In *Cardella*, the plaintiff accepted a contract through conduct because, although the parties had not exchanged executed contracts, the plaintiff sent an email to the defendants' attorney stating, "*we have fully executed*

While Robertson claims that parties orally discussed and finalized the terms of the Buyout Contract on April 13 and 14, he fails to point to specific facts showing that Houweling manifested an intent to be bound by those negotiations. Robertson, in his Opposition, offers the legal conclusion that "Casey Houweling and Robertson discussed and finalized the terms of the Buyout Contract" but does not point to facts to support his conclusion. Put simply, Robertson doesn't point to any facts from the conversations showing that Houweling manifested an intent to be bound; he simply offers the legal conclusion that Houweling agreed to the terms of the alleged Buyout Contract. Robertson attempts to create a genuine dispute by making reference to his conversations with Casey Houweling, but Robertson has failed to show that there is more than some metaphysical doubt as to the material facts.

The parties' failure to enter into a valid contract is further shown by the fact that the parties continued to negotiate the terms of the proposed letter agreement after the time Robertson alleges it was consummated. Cummings emailed Robertson on April 15, 2014, and raised concerns with the language of the proposed letter agreement: "My interpretation of the second sentence is that you expect to earn an additional Consulting Fee of $15,000 per month, **over and above** the $105,000 to be paid as per item 8 below. . . . Can you please clarify this as the sentence is at odds with the above noted." (emphasis in original). Cummings also wrote, "I'm making a few other minor edits which I will forward to you after this item is clarified." *Id.* That same day, Robertson emailed Cummings to clarify the language, and Cummings responded, "Ok, George. The intent is clear. *I shall make some amendments to the wording so it is more clear.*" (emphasis added). Thus, as of April 15, 2014, Houweling and Robertson continued to negotiate

---

*contracts*." *Id.*, at *5 (emphasis in original). Unlike *Cardella*, Houweling never told Robertson that it executed the April 14 draft letter agreement. In fact, Houweling's and Robertson's communications show that they intended, but failed, to execute an agreement at some point during the week of April 21, 2014.

and revise the proposed letter agreement, indicating that they had not manifested an intent to be bound to the agreement. *See 1-800 Contacts v. Weigner*, 127 P.3d 1241, 1243 (Utah Ct. App. 2005) (holding that the parties' email communications failed to create a valid contract because the "Defendant clearly and unambiguously reserved the right to modify or rescind its offer up to and until the time the parties executed a written agreement").

Robertson admits in his Opposition that Cummings' emails on April 15, 2014, show "a desire to be clear on a particular future payment provision." If further negotiations regarding the terms in the writing were required to provide clarity, as Robertson admits, then the parties could not have entered into a valid contract on the terms of the proposed letter agreement. *See Cessna Finance Corp. v. Meyer*, 575 P.2d 1048, 1050 (Utah 1978) ("[C]ontractual mutual assent requires assent by all parties to the same thing in the same sense so that their minds meet as to all terms.") (quoted in *Homestead Golf*, 224 F.3d at 1199).

Further evidencing that Houweling did not accept the terms of the April 14 proposed letter agreement is the fact that the letter agreement did not address Houweling's tax concerns. On April 13, 2014, Cummings had informed Robertson that Houweling was concerned with the tax implications of Robertson's proposed structure:

> [Casey Houweling] is having second thoughts about the income tax structuring that you have proposed, and in any event, this would need to be adjusted for payments up to the end of 2012 as we have already disclosed these payments to the US Government as Consulting Fees paid to you. *Based upon our tax advice, we believe that the fact pattern does NOT support a sale of a Development Interest and would be reversed if we were subsequently audited, potentially exposing Houweling[] to additional payments on your behalf, penalties and interest*.

(emphasis added). Robertson's subsequent proposals did not address this concern, and thus it was unreasonable for Robertson to believe that Houweling would accept the terms of his April

14 proposed letter agreement without including some provision that would protect Houweling from "additional payments on [Robertson's] behalf, penalties and interest."[3]

Finally, Robertson himself admits that he never accepted the April 26, 2014 letter agreement that included a tax indemnification provision. He testified, "It says right there 'may pay to the IRS any remaining amounts owing to Robertson.' I'm not sure anybody would agree to that, but I didn't." Thus, Robertson has failed to show that he and Houweling entered into an agreement concerning additional bonus compensation because both parties manifested an intent to defer legal obligations until a formal contract was executed, which never happened.[4]

In sum, the undisputed facts show that Houweling never manifested an intent to be bound to the alleged Buyout Contract, and thus Houweling is entitled to judgment as a matter of law on Robertson's claims for breach of written contract and breach of oral contract.

## C.       Breach of the Covenant of Good Faith and Fair Dealing

Robertson claims that Houweling breached the implied covenant of good faith and fair dealing when it acted to deprive him of the value of the alleged Buyout Contract and frustrated the purpose of that agreement. However, Robertson's claim for breach of the implied covenant depends on the existence of a valid contract. *See Peterson & Simpson v. IHC Health Servs., Inc.*,

_____

[3] While Robertson claims that he somehow resolved the tax issues with Houweling, the only evidence he has to support this claim is an April 13 email in which he wrote, "There will be no tax issues for Houweling." However, there was no provision in Robertson's April 14 proposed letter agreements providing that there would be "no tax issues for Houweling."

[4] Robertson, citing *O'Hara v. Hall*, 628 P.2d 1289, 1291 (Utah 1981), argues that summary judgment is inappropriate because the parties dispute the "intent and import of their own communications and actions." *O'Hara* does not stand for this proposition. In fact, Robertson misrepresents the holding of the case by claiming that the court "revers[ed] summary judgment and remand[ed]." In *O'Hara*, the court reversed the district court because "*[a]t trial*, the judge listened to extensive *conflicting testimony* by both parties and then ruled *as a matter of law* that the parties had entered a binding construction contract." *Id.* at 1290 (emphasis added). *O'Hara* is not a case where the parties merely disputed the legal significance of their actions at summary judgment, as is the case here. *See id.* at 1290-91. Instead, *O'Hara* was a case where there was "conflicting testimony" at trial concerning the facts relevant to contract formation. *Id.*

217 P.3d 716, 722 (Utah 2009) ("[The covenant of good faith and fair dealing] exist[s] whenever a contract is entered . . . ."); *Black Educ. Network, Inc. v. AT&T Broadband, LLC*, 154 Fed. App'x 33, 47-48 (10th Cir. 2005) (unpublished) (holding that, in the absence of a contract, broadcast company could not sue seller and broker for breach of the implied covenant of good faith and fair dealing). Because Robertson has failed to establish the existence of a valid contract concerning additional compensation, his claim for breach of the implied covenant of good faith and fair dealing fails as a matter of law.[5]

### D.    Declaratory and Injunctive Relief Claims

Robertson seeks a declaration (1) that he has an ownership interest in the Utah greenhouse project "of at least 50%," (2) that he "has fulfilled all of his duties under the Buy Out Contract," and (3) that Houweling has "not performed under the Buy Out Contract and [is] obligated to pay Robertson the full amounts provided by the Buy Out Contract."

Robertson's first request fails as a matter of law because the undisputed facts show that Robertson has no ownership interest in the greenhouse project. Although Robertson discussed a potential ownership interest in the greenhouse project on several occasions, Houweling never agreed to give Robertson an ownership interest nor did Robertson ever acquire such interest. Indeed, Robertson's counterclaim characterizes his interest in the greenhouse project as a "demand for equity ownership." Robertson does not own the real property or any of the personal property involved in the greenhouse project. He was not the borrower or a guarantor on the bank

---

[5] Even if the parties had entered into the alleged Buyout Contract, Robertson has failed to show that Houweling breached the implied covenant of good faith and fair dealing. In his Opposition, Robertson merely argues that Houweling was bound by the covenant of good faith and fair dealing without setting forth specific facts and legal arguments as to how Houweling breached it. *See* Opp'n at 35; *see also St. Benedict's Dev. Co. v. St. Benedict's Hosp.*, 811 P.2d 194, 200 (Utah 1991) ("To comply with his obligation to perform a contract in good faith, a party's actions must be consistent with the agreed common purpose and the justified expectations of the other party.").

financing for the greenhouse project. And he does not own shares in the Houweling entity that owns the real estate and personal property that comprise the greenhouse project. With the exception of putting money down on a truck, Robertson did not contribute any money to buy land and equipment for the greenhouse project. In fact, Robertson, in his Opposition, admits that he "had no ownership interest in the [greenhouse] Project."

Robertson's claim that the April 23, 2012 Non-Disclosure Agreement and the unexecuted Consulting Agreement "refer to Robertson's ownership status in the [greenhouse] Project" is also without merit. Neither document makes any mention of Robertson's alleged ownership interest. In fact, the unexecuted Consulting Agreement provided that "Houweling's and Robertson agree that Robertson shall perform his duties under this Agreement as an *independent contractor*." (emphasis added). In sum, neither document supports Robertson's claim that he had an ownership interest in the greenhouse project.

Robertson's claim that he and Houweling formed a joint venture is similarly flawed. The parties never used the term "joint venture" to describe the greenhouse project, and the parties did not act in a way that would have formed a joint partnership under Utah law.[6] Moreover, Houweling rejected Robertson's initial proposals that Houweling form a partnership with Robertson's entity Yuum A. In short, the undisputed facts show that Robertson did not enter into a joint venture with Houweling.

---

[6] *See Rogers v. M.O. Bitner Co.*, 738 P.2d 1029, 1032 (Utah 1987) ("The requirements for [a joint venture] are not exactly defined, but certain elements are essential: the parties must combine their property, money, effects, skill, labor and knowledge. As a general rule, there must be community of interest in the performance of the common purpose, a joint purpose, a joint proprietary interest in the subject matter, a mutual right to control, a right to share in profits, and unless there is an agreement to the contrary, a duty to share in any losses which may be sustained." (quoting *Basset v. Baker*, 530 P.2d 1, 2 (Utah 1974))).

Robertson's first request also fails because he cannot specifically identify what type of ownership interest he claims to have in the greenhouse project. *See* Countercl. ¶ 51 (claiming an ownership interest "of at least 50%"). Robertson's lack of specificity demonstrates that there was never a definite agreement as to what his ownership interest would be, if any. *See Richard Barton Enters.*, 928 P.2d at 373 ("An agreement cannot be enforced if its terms are indefinite . . . ."). Accordingly, Robertson's first request fails as a matter of law because he has failed to show that he has any ownership interest in the greenhouse project.

Robertson's second and third requests also fail as a matter of law because, as discussed above, Houweling never accepted the terms of the alleged Buyout Contract. Because Houweling never accepted the alleged Buyout Contract, Robertson is not entitled to a declaration that he has fulfilled his duties under the contract and thus is owed compensation under the contract. Accordingly, Houweling is entitled to summary judgment on Robertson's claim for declaratory and injunctive relief.

**E.      Third Party Claims Against Casey Houweling**

Even if Robertson had a valid breach of contract claim against Houweling (he does not), there is no basis for Robertson's third-party claim against Casey Houweling. Robertson claims, without citing any law, that Casey Houweling is a necessary party because this Court may need to "determine the respective ownership interest of the parties." However, Casey Houweling does not claim to hold an ownership interest in the greenhouse project in his individual capacity. Instead, Houweling has established that Houweling Utah Property, Inc. is the owner of the greenhouse project. Accordingly, Robertson's third-party claim against Casey Houweling is dismissed with prejudice because the Court need not adjudicate Casey Houweling's non-existent interest in the greenhouse project.

### F.      Houweling's Claim for Declaratory Judgment

Houweling seeks a declaratory judgment (1) that Robertson has no ownership interest in the greenhouse project and (2) that Robertson has no right to any further compensation related to the greenhouse project. Houweling's claim is a mirror image of Robertson's declaratory judgment claim (*i.e.*, if Robertson's declaratory judgment claims fails as a matter of law— and it does—then Houweling is entitled to prevail on its declaratory judgment claim). Because Robertson's claim for declaratory judgment fails as a matter of law, the Court grants Houweling's claim for declaratory and injunctive relief.[7]

## IV.    Conclusion and Order

For the reasons set forth above, this Court GRANTS Plaintiffs' Motion for Summary Judgment. It is hereby ORDERED that Plaintiff is entitled to judgment in its favor on Defendant's claims for (1) breach of oral contract, (2) breach of written contract, (3) breach of the implied covenant of good faith and fair dealing, and (4) declaratory and injunctive relief. It is further ORDERED that plaintiff is entitled to judgment in its favor on its claims for declaratory relief. Specifically, it is DECLARED (1) that Robertson has no ownership interest in the

---

[7] At oral argument, counsel for Houweling suggested that Robertson would be required to disgorge $100,000 if the Court finds in favor of Houweling. But Houweling failed to make this request in its complaint or any of its later filings. Notably, Houweling omitted this request from its request for declaratory judgment and instead seeks a declaration that "Robertson has no right to *any further compensation* related to the [greenhouse] Project." (emphasis added). Houweling would need to amend its complaint to include such a request, and the deadline to file amended pleadings passed over two years ago on February 16, 2015. Robertson also conducted discovery without any suggestion that Houweling would seek to disgorge the $100,000 it paid to Robertson. Accordingly, the Court holds that Houweling cannot seek to disgorge the $100,000 paid to Robertson, especially when the issue was first raised at oral argument on August 23, 2017. *See Bylin v. Billings*, 568 F.3d 1224, 1229 (10th Cir. 2009) (courts may deny leave to amend when there is "undue delay, undue prejudice to the opposing party, bad faith or dilatory motive, failure to cure deficiencies by amendments previously allowed, or futility of amendment").

greenhouse project and (2) that Robertson has no right to any further compensation related to the greenhouse project.

DATED September 1, 2017.

_____
Judge Jill N. Parrish
United States District Judge